UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD GRUNAUER, | ) | |
| | ) | |
| Plaintiff, | ) | No: 08 C 1430 |
| | ) | |
| vs. | ) | Judge Shadur |
| | ) | |
| | ) | Magistrate Judge Ashman |
| KOMATSU FORKLIFT U.S.A. and AUTOMOBILE | ) | |
| MECHANICS LOCAL 701. | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, EDWARD GRUNAUER, by and through his attorney, Michael T. Smith, states

and complains of the Defendants as follows:

### JURISDICTION AND VENUE

1. Plaintiff brings this as an action against Defendant, KOMATSU FORKLIFT U.S.A.

("KOMATSU") for discharge and Failure to abide by a mandatory Arbitration Decision,

in violation of a collective bargaining agreement; against Defendant, AUTOMOBILE

MECHANICS LOCAL 701 ("LOCAL 701") for breach of its duty of fair representations

of a members.

2. This action arises and the jurisdiction of this Court is based upon, Section 301 of the

Management Relations Act, as amended, 29 U.S.C. § 185.

3. Plaintiff has exhausted all administrative remedies provided for the parties'

collective bargaining agreement and has timely filed this suit after Plaintiff received

notice of the breach of duties owed under the collective bargaining agreement by

KOMATSU, and LOCAL 701 after receipt of notice of not receiving fair representation by his Union.

## VENUE AND THE PARTIES

4. Plaintiff resides at 23754 Saddle Creek Road, Manhattan, Illinois.

5. Plaintiff is a citizen and resident of Will County, Illinois.

6. At all times relevant, KOMATSU is a foreign corporation doing business in Illinois with over 500 employees.

7.    Defendant Local LOCAL701 is a not-for-profit corporation in Illinois with its principle place of business located in Cook County, Illinois, and has a responsibility to protect the rights of its local members.

8. At all times relevant herein, Defendant KOMATSU and Defendant, Local 701 were parties to a written collective agreement, entitled "Articles of Agreement" between Local 701 and KOMATSU referred to as "Collective Agreement."

9. At all times relevant herein, the Collective Agreement governed the terms and conditions of Plaintiff's employment with Defendant KOMATSU.

## AS AND FOR A FIRST CAUSE OF ACTION

## DEFENDANT KOMATSU' BREACH OF COLLECTIVE AGREEMENT

10. Paragraphs I through 9 are incorporated herein by reference.

11. Plaintiff began his employment with Defendant KOMATSU in March of 1994.

12. At all times relevant herein, Plaintiff was employed by Defendant KOMATSU at the Alsip, Illinois branch location as a full time mechanic employee.

13. On or about November 21, 2007, Defendant breached the Collective Agreement when it summarily terminated Plaintiff's employment, without just cause, in violation of

2

the Collective Agreement.

14. After, said wrongful termination and pursuant to the "Collective Agreement" the matter was submitted to binding arbitration.

15. After arbitration, the Arbitrator on July 13, 2007, ruled in favor of Plaintiff and set forth an Award which KOMATSU, has refused to follow. (See Exhibit A & B) At all times since that date, Defendant KOMATSU has refused to reinstate Plaintiff to his former position of employment up to the filing date of this complaint.

16.    As a direct and proximate result of the breach of the Collective Agreement by Defendant KOMATSU Plaintiff has been damaged by loss of his employment in a sum which he would have earned from such employment had Defendant KOMATSU not wrongfully terminated Plaintiff; additionally, Plaintiff has been damaged by loss of seniority, loss of fringe benefits, loss of other benefits to which he was entitled under the Collective Agreement, physical hardship, and severe and continuous emotional distress.

WHEREFORE Plaintiff EDWARD GRUNAUER, by counsel, respectfully prays the Court to advance this case on the docket and expedite it in every way to issue a judgment that Defendant KOMATSU' acts, policies, practices, and procedures complained of herein violated Plaintiffs rights under Section 301 of the Labor Management Relations Act; to award Plaintiff back pay, future pay, compensatory relief in the form of emotional pain, suffering, inconvenience, mental anguish, and lose of enjoyment of life and consequential damages to make him whole; to enjoin Defendants from the same discriminatory conduct in the future; to grant Plaintiff the costs of this action and attorney fees; to grant Plaintiff a jury trial on those issues triable by jury; and to allow such additional relief as the Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION

## BREACH OF DUTY OF FAIR REPRESENTATION BY DEFENDANT LOCAL 7011

17.  Plaintiff incorporates paragraphs I through 16 herein by reference.

18.  At all times material herein, Defendant Local 701 owed a duty of fair representation to all members, including the Plaintiff, i.e. the duty to represent Plaintiff and all other members of APWU in the administration of the Collective Agreement without arbitrary discrimination. In the Arbitration hearing, Defendant, LOCAL 701, allowed certain derogatory material and facts to be presented to the arbitrator, which had previously been agreed between the Defendant KOMATSU and LOCAL 701 to not submit.

19. LOCAL No. 701 breached its duty of fair representation when Plaintiff contacted his Local 701 union representatives after Plaintiff received KOMATSU's letter of July 28, 2007, wherein agents of KOMATSU stated conditions for Plaintiff's return to employment which were different than the Arbitration Award letter of July 13, 2007. (See Exhibit "A" and "B").

20. Union representatives of LOCAL 701, told Plaintiff that they would make KOMATSU abide by the Arbitration Award dated July 13, 2007, and Plaintiff should not return to work under KOMATSU's deviation from the Arbitration Award.

21.  Since that contact by Plaintiff with union representatives of Local 701, Defendant Local 701 has violated and breached its statutory duty of fair representation by not filing grievances or see that Plaintiff is allowed to retrun to work based upon the clear mandate of the Arbitration Award after Plaintiff's request.

22.    Defendant Local 701's treatment of the Plaintiff was capricious, arbitrary, and discriminatory

4

23.    As a direct and proximate result of the breach by Defendant 701, of its duty of fair representation to Plaintiff, as herein alleged, Plaintiff has been damaged due to his termination by Defendant KOMATSU in a sum which he would have earned from such employment had Defendant KOMATSU not wrongfully terminated Plaintiff; additionally, Plaintiff has been damaged by loss of his seniority, loss of fringe benefits, loss of other benefits to which he was entitled under the Collective Agreement, physical hardship, and severe and continuous emotional distress.

WHEREFORE Plaintiff, EDWARD GRUNAUER, by counsel, respectfully prays the Court to advance this case on the docket and expedite it in every way to issue a judgment that Defendant Local 701 acts, policies, practices, and procedures complained of herein violated Plaintiffs rights under Section 301 of the Labor Management Relations Act; to award Plaintiff back pay, future pay, compensatory relief in the form of emotional pain, suffering, inconvenience, mental anguish, and lose of enjoyment of life, and consequential damages to make him whole; to enjoin Defendants from the same discriminatory conduct in the future; to grant Plaintiff the costs of this action and attorney fees; to grant Plaintiff a jury trial on those issues triable by jury; and to allow such additional relief as the Court deems just and proper.

EDWARD GRUNAUER

BY

Michael T. Smith
Trial Attorney


Michael T. Smith # 6180407IL
440 W. Irving Park Road
Roselle, IL 60172
(847) 895-0626

BEFORE
JAMES R. COX
ARBITRATOR


KOMATSU FORKLIFT U.S.A.

and

EDWARD GRUNAUER DISCHARGE
AAA 51 300 00130 06

AUTOMOBILE MECHANICS
LOCAL 701


### DECISION AND AWARD

The Hearing in this matter was conducted by the Arbitrator in Alsip, Illinois April 27, 2007.  Representatives Evan Mickies and Robert Lessmann presented the Local 701 case. Attorney John Kuenstler represented Komatsu. Following receipt of the Transcript, Post-Hearing Statements which I received July 9, 2007 were filed with the American Arbitration Association.

### THE ISSUE

The issue before the Arbitrator is whether there was cause for the termination of Edward Grunauer and, if not, what should be the remedy. There are no questions of Arbitrability. The matter is properly before me for final and binding resolution.


### APPLICABLE CONTRACT PROVISIONS

*Article 9 - Warning Notice and Discharge*

*Employees shall not be discharged without cause such as intoxication, drinking, gambling, possession or use of narcotics, or stealing on the job.  The foregoing enumeration of causes for discharge is by way of illustration only and shall not be deemed to exclude the Company's right to discharge Employees for other cause. For violation of Company Rules which shall be considered*

1

EXhibiT A

*minor, the Company shall give the Employee a Warning Notice in writing of such unsatisfactory work or conduct and the proper official of Local 701 shall be given a copy of the Warning Notice. [1] Warning Notices shall be valid for a period of one year. After the second notice the Employee could be subject to dismissal if the Company feels there is reason for discharge.*

*A Written Warning Notice will be given an Employee within 15 working days from the date of a Work Rule violation.*

## THE FACTS

Ed Grunauer, employed by Komatsu Forklift U.S.A. since March 1994, was terminated in November 2005. His discharge had been triggered by misconduct November 10, 2005 preceded by serious insubordination in May 2005 – insubordination which brought the Warning described below.

The Termination Letter dated November 21st asserts that Grievant had, *"created an offensive work environment that is unacceptable to many of your associates. Failure to respond to the Company's warning that you must behave appropriately is also grounds for termination of employment."*

**The November 2005 Insubordination**

Thursday, November 4, 2005, shortly before his 3:30 p.m. quit time, Grievant was heard making a series of loud guttural sounds/grunts. General Manager Scott Eller perceived those sounds as having come from the Shop Area. He and Service Administrator Chris Stotts had been at their desks in the nearby Service Office. Eller shouted, *"Stop"*. The sounds immediately ceased. As Eller recalled, they had lasted only a relatively short time - *"Only about 20 to 30 seconds."* Eller had not observed Grievant when the sounds or *"expressions"* were first heard nor did he know who was out in the Shop Area at that time.

Shortly thereafter, Grievant identified himself as having made the noises. He came to the Service Office door and made a *freedom of speech* contention, asking about Eller's objection. What Mr. Eller specifically ordered Grievant to do at that point has special significance to the outcome of this case.

Mr. Eller testified that he had told Edward Grunauer that such noises were offensive, upset him, had caused Ms. Stotts to put a caller on hold, the situation was embarrassing and his expressions were not *freedom of speech.*

_XA_

---

[1] The insubordination in this case was not minor

A LOUD TONE. NOT WHAT WAS SAID [2]

Eller directly told Grievant to stop.[2]   He said that his response had been triggered by the reaction of Chris Stotts. When the noises were first made he saw her place a caller on hold. As mentioned, he told Grievant about it.   Chris Stotts testified that she had found Grievant's noises particularly offensive because were similar to sounds made by a disabled person and/or a stroke victim[3].

Ms. Stotts had been talking on the phone when what was described as a mimicking expression began.  She recalled Grievant standing near the door to the Service Office as he made those sounds.   There is a time clock just outside the Office  -  to the left as one exits. Grievant admitted during this testimony that, as he was waiting to punch out,  he had been loud along with two or three other employees. He did not deny having made an expression similar to what he had heard on a T.V. Show – *Tool Time*. That was the expression that Mr. Eller and Ms. Stotts found offensive.  Ms Stotts was embarrassed by the sounds since she believed the customer with whom she had been talking heard them before she could put her call on hold. She explained that she found the comments particularly offensive because Mr. Grunauer was *"making light of somebody who has a handicap"*.

Ed Grunauer admitted, *"I made the comment like the Tool Time Show like, what, I don't know"* and that is the sound I made."  He described the sound as like a *"whoop"* and said it is an expression intended to express *"bewilderment, not understanding"*.  Grunauer recalled Scott Eller telling him, *"Ed, you guys are being too loud. We can't hear, what's going on here…you guys are not even saying anything worthwhile out there"*. When Grunauer told Mr. Eller the men understood what each other was saying, he said Scott Eller responded, *"Shut up. Don't talk. I don't want to hear one word out of you"*. Grievant testified that he then had asked Scott if he were taking his *freedom of speech* away. He punched out and went home. Thereafter he did not receive any warning or counseling for the mimicking.

As far as the evidence shows, General Manger Eller had not had any further conversation with Grievant about the sounds that day – Grievant had gone home that Friday.   There was no discussion of why the expression used was *offensive*. That was obvious. Significantly however, there was no direction not to use the expression again. In assessing the credibility of Grunauer's denial that Eller had told him the mimicking expression was

---

[2] While  Service Manager Scheffers submitted an affidavit which stated that Mr. Eller had told him that he had counseled Mr. Grunauer to *"never speak in this manner again"* Mr. Eller's testimony did not support that contention. Mr. Scheffer also wrote that prior to November 10th , he had *"not heard any employees speaking in manner that mocked individuals with a mental disability."* This was contrary to Ms.Stotts testimony.

[3] Ms. Stotts recalled a close family relative who spoke similarly following a stroke. She also had experience with the speech of a mentally challenged friend.

3

*offensive*, I note that Grievant testified that he was going to Las Vegas on vacation the following week and explained his exuberance that Friday afternoon near the time clock saying that he had been *"pretty pumped up"* about the trip. He did not vacation that following week.

The following Thursday, November 10th, Scott Eller again heard Grievant making the same loud guttural, mimicking grunts. This time Employee Tom Mercer was involved in the same behavior. Ms Stott said she had heard Mercer making such objectionable sounds before November 4th *"at least a few"* times. When Scott Eller checked with other Employees, they told him that they had heard Grievant make, what Eller called, *"That type of noise."* Although Scott Eller testified that he had not previously heard such mimicking noises in the Shop, the evidence established that Grievant had been simulating expressions of a handicapped person even before the Company had moved to their new Alsip facility in August 2005[4]. Grunauer does not deny making such sounds but claims they have no relationship to mimicking a handicapped person. He admits that on the 10th he had made sounds similar to those he had been making on the 4th when Scott Eller told him to stop.

It was shown that <u>other Bargaining Unit Employees</u> had made the same noises, which Grievant said were based on the speech pattern of actor Tim Allen on the *Tool Talk* T.V. show.[5] Mercer made the same attribution. There was no evidence, however, that any of the other employees who had uttered the described *"bewildered whoops"* had been involved in the serious insubordination for which Grievant had been reprimanded in Spring 2005 or that they had been instructed to stop such behavior. However, there was no evidence that any other employee had been criticized for making such mimicking sounds before November 10th.

Service Administrator Chris Stotts had been a *Tool Talk* listener and testified that the handicap like mimicking sounds Grievant made at work on the 4th were dissimilar to the expressions on the Tim Allen Show. From my limited audit of the video played during the Hearing, I did not find the sounds on the Show had any relationship to sounds disabled individuals necessarily make in their efforts to communicate.

---

[4] Ms. Stotts testified that she had heard others in the Shop making such sounds – "I can tell you for a fact that Ed had done it in the past and so had one other mechanic." She recalled having heard Tom Mercer make the sound "at least a few times" before the Company had moved to the new building in August 2005. Mr. Rich Kucia had also made the guttural noises according to an investigation conducted by Human Resources and was involved with Grievant on the 10th. Kucia and Mercer received documented verbal warnings.

[5] The show had a Home Improvement format and was known as *Tool Talk*.



### The May 2005 Warning

Grievant had previously engaged in insubordinate conduct. During Spring 2005, Komatsu had made a change in the Prescription Safety Glasses Benefit. Grievant became irritated when the Company failed to reimburse him for the cost of certain non-standard options. According to uncontested evidence, during the morning of May 3rd, went up to his Supervisor, Rich Scheffers, and told him, *"You are a dick with ears."* He was sent home but later paid for the day! He returned to work and, as the Written Warning he received reads, "*As a condition of continuing employment, you must demonstrate acceptable behavior. You must manage your anger and you must show respect to your Supervisor.  You are not required to agree with everything that a Supervisor or Manager may say or do; however, a reasonable Employee expresses his disagreement in a mature, controlled manner."* The Warning Notice concluded with a serious sanction:

> *If your failure to control your behavior should again require a response from Management, you will subject yourself to disciplinary action up to and including the immediate termination of your employment.*



While Grievant Gruenauer got a big break in May 2005, it had been made clear to him that further failure to control his behavior would jeopardize his job.

### The Grievance

Following his November 2005 discharge, Grievant Grunauer filed a timely Grievance November 22nd.

The Company responded that, "*The facts of the situation and our investigation show that Mr. Grunauer was insubordinate. After being instructed to stop this behavior, Mr. Grunauer continued to conduct himself in an unacceptable manner.  Historically we agree that insubordination is a major violation and cause for termination. Therefore Komatsu Forklift USA Inc. denies the Grievance. . . ."*

### ANALYSIS

Grievant admits having made the objectionable mimicking to which Mr. Eller objected on both the 4th and the 10th .  He denies that Mr. Eller told him that the mimicking was *objectionable.*  However, as we have seen, Grievant misrepresented the reason he had been *pumped up* Friday the 4th. Ed Grunauer

that he did tell Grievant that his conduct was *objectionable*. However, there is no evidence that he had instructed Grunauer <u>not</u> to behave in that manner <u>in the future</u>.

There had not been any previous objections to employee use of such mimicking expressions at work. Service Administrator Stotts confirmed the assertions of Grunauer and others that <u>employees had been using the</u> *<u>mimicking expression</u>* to which Mr. Eller objected November 4th in the Shop for some time – even before the move to the new Alsip facility a few months before. One of those employees, <u>according to Ms. Stotts</u>, had been Tim Mercer.  Mr. Eller denied having heard any employee use the expression.

Until November 4th, no one had ever told Grievant or any other employee not to use the objectionable expressions. Two Employees were disciplined <u>after</u> November 10th for having made such sounds - Tom Mercer who had exchanged such expressions with Grievant November 10th and was identified by Ms. Stotts as having previously used the expression -- and Rich Kucia. <u>These employees received warnings</u>.  Although Grievant had been heard using the objectionable expression on the 4th, <u>he was not given any disciplinary warning</u>. He was told by the General Manager that his conduct was objectionable and to stop.

While Grievant had been directed to cease the handicapped  expression November 4th , <u>an examination of what was said to him raises the question of whether Mr. Eller's objection had been triggered by the noise level and interference with the telephone call or because the expression  was perceived to be mimicking and mocking the handicapped.</u>  Mr. Eller told Grunauer that what he was saying was *objectionable* but did not explain further. After the instruction to stop that Friday, there was no follow up regarding the objectionable nature of the expression  the following week.

While the termination letter states that three Employees had found Grievant's conduct on November 10th to be offensive,  it appears that these opinions were <u>responses</u> during interviews initiated by Komatsu in the course of the investigation. While the Company found <u>the content</u> of Grievant's remarks offensive because they "*could best be described as grunts, moans, groans, and mumblings* <u>*which mimic a person with an intellectual handicap and a speech impediment*</u>," no employees at the Plant had such an affliction and there was no object of the mimicking. There is no contention that any disabled person had been belittled or that Grievant had intended to embarrass any disadvantaged person by his remarks. The insubordination here consisted of Grievant's failure to stop conduct the General Manager had told him was offensive and which, would be commonly seen as repugnant.

6

## AWARD

To repeat, Grievant admits having used the mimicking expression November 4th and that Mr. Eller told him to stop. I credit the General Manager's testimony that he had also told Mr. Grunauer that his expression was objectionable. Grievant knew or should have known such a mimicking expression was unacceptable to the General Manager when, less than a week later, he admittedly used that very same expression in a loud manner in the presence of other employees. Grunauer's use of that expression on the fourth working day after he had been told to stop clearly was insubordinate. There are, however, mitigating factors which warrant discipline less than discharge. In assessing the degree of discipline, I recognize that Grievant had been given a warning only six months before for another type of insubordinate conduct. He was told that failure to control his behavior would subject him *"to disciplinary action up to and including the immediate termination of your employment"*. Had there not been that incident of egregious insubordination in May, there would have been a back pay remedy here considering the testimony that Komatsu had tolerated the clearly objectionable mimicking expressions made by Grievant and other employees until November 4th.

Grievant's behavior November 10th certainly warranted serious discipline. However I cannot overlook testimony from both Union and Company witnesses that employees had been using the objectionable mimicking expressions for some time in this relatively small Shop where it would have been likely that Management would be aware of it. While there was insubordination proven for engaging in conduct the General Manager had told him was objectionable[6], considering all these circumstances, I find a suspension to be appropriate discipline.

Within 15 days of the date of this Award, Grievant is to be offered reinstatement with full seniority but without back pay or benefits. I will retain jurisdiction for 30 days should there be any dispute with respect to the remedy. The Grievance is granted in part as provided above.

James R. Cox
Arbitrator

Issued this 13th day of July 2007.

---

[6] According to the General Manager's testimony, Grievant had not been told to *"never speak in this manner again"* as the Service Manager's Affidavit asserts Eller had told him. While Ed Grunauer has an opportunity to return to Komatsu, he should be aware that, considering the May Warning and the discipline here, further proven insubordination will certainly jeopardize his job.



# KOMATSU

**Komatsu Forklift U.S.A., Inc.**
14481 Lochridge Boulevard
Covington, Georgia 30014
Tel: 770-787-5100
Fax: 770-784-0700

July 28, 2007

Ed Grunauer
23754 Saddle Creek Road                                     <u>Delivered by courier and UPS</u>
Manhattan IL 60442

Dear Ed,

In compliance with the *Decision and Award* of Arbitrator James R. Cox dated July 13, 2007, Komatsu Forklift of Chicago, a wholly owned subsidiary of Komatsu Forklift USA, Inc., offers to you the following:

- Reinstatement with full seniority (i.e., 8 years, 8 months prior service).
- No back pay or benefits.

Your position will be Mechanic - Journeyman; however, you will be required to perform other duties as necessary and at management's discretion, which fall up to and/or within your pay grade. By way of example only, you may be instructed to perform mechanical functions, painter functions, or utility functions. You will be located at the company's Alsip IL location. Your hourly rate will be based on your pre-termination rate, per the contractual increments in the interim (i.e. currently $24.45 per hour). Your work will be supervised directly by the Service Manager, Johnny Livingston.

This offer is subject to the following:

- Negative results on a urine/drug screen prior to your start date (contact Scott Eller, General Manager, to make arrangements for this procedure).
- Final decision by a court of law, as the company intends to and hereby expressly reserves its right to appeal the arbitrator's award.
- Your termination letter dated November 21, 2006 and all other warning letters in your personnel file remain intact, and, if you accept this offer of reinstatement, then this letter in and of itself becomes a "last chance" warning letter.
- Since the arbitrator's award held that "[g]rievant's behavior November 10[th] certainly warranted serious discipline," if you should ever again engage in any conduct that is objectionable or unacceptable to management, or if you should ever again engage in any conduct that warrants discipline (e.g., insubordination, mimicking expressions, retaliation, harassment, etc.), then you will subject yourself to the strongest disciplinary response that company policy affords (i.e., termination of employment).

If you chose to accept this offer of reinstatement, then please sign below and fax this letter to the confidential Corporate Human Resources fax at 770-788-3495 no later than the close of business (i.e., 5 p.m. EDT) on Wednesday, August 1, 2007; thereafter, this offer is null and void. Your start date will be no later than Monday, August 6, 2007.

Sincerely,
Komatsu Forklift USA, Inc.

*Linda Branght*

Linda Branght
Sr Manager – Corporate Human Resources

CC:     Evan Mickles; Automobile Mechanics Local 701

Accepted:

_____          _____
Ed Grunaner                                              Date

*EXhibiT B*